## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LINDA M. HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-03-S-0106-NE** |
| | ) | |
| **THE CASTNER-KNOTT** | ) | |
| **DRY GOODS COMPANY** | ) | |
| **D/B/A DILLARD'S,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This action is before the court on defendant's motion for summary judgment.[1]

Federal Rule of Civil Procedure 56 provides, in pertinent part, that summary judgment "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

---

[1]Doc. no. 26.

*v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*). The motion pierces the pleadings, and "strikes at the heart of the claim. In effect it argues that as a matter of law upon admitted or established facts the moving party is entitled to prevail." Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed. 1994). Applying these principles to the pleadings, briefs,[2] and evidentiary materials,[3] the court concludes defendant's motion for summary judgment should be granted.

---

[2]Doc. no. 30 (Defendant's Brief); doc. no. 35 (Plaintiff's Brief). This action is also before the court on defendant's motion for leave to reply (doc. no. 37) to plaintiff's brief opposing summary judgment (doc. no. 35). This motion is granted. The court will consider "Defendant's Reply Brief in Support of its Motion for Summary Judgment."

[3]Doc. no. 29 (Defendant's Evidentiary Submission); doc. no. 31 (Plaintiff's Evidentiary Submission).

# I. FACTS

Plaintiff, Linda M. Harris, is an American citizen with African ancestors ("African American" or "black").  Defendant employed her as a Sales Associate in two of its "Dillard's" department stores during three discrete periods.  Plaintiff first worked at the Dillard's store located in Richmond, Indiana for three months, from August 16 to November 29, 1999, but resigned to take time off for the holidays.[4]  She reapplied for the same position in the same store on February 2, 2000, and defendant re-hired her that same day.[5]  This second period of employment lasted five months, until June 30, 2000.  Plaintiff resigned in anticipation of moving to Alabama.[6]

Plaintiff appeared satisfied with her first two periods of employment, informing defendant prior to her departure from the Richmond, Indiana store:  "It is with regret that I will be resigning from my position as Sales Associate.  I have enjoyed working here."[7]  In the same letter, plaintiff asked defendant to transfer her to a Dillard's department store in Alabama, a request that was accommodated.[8]

Plaintiff began her third and final period of employment with defendant on or about September 9, 2000, at the Dillard's department store located in the "Madison

---

[4]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 55, Exhibits 9-11.

[5]*Id.* at Exhibit 13.

[6]*See id.* at Exhibit 16.

[7]*Id.*

[8]*Id.*; *see also id.* at Exhibit 17 ("Transfer Agenda").

Square Mall" in Huntsville, Alabama.[9]  This final period of employment lasted slightly more than four months, until January 17, 2001, when plaintiff was fired.

Steve Moretti was Manager of Dillard's Madison Square Mall store, and Mary Davis was Operations Manager.[10]  While neither Moretti nor Davis made racially-insensitive remarks directly to plaintiff or in her presence, plaintiff says that she learned "through other people" that each was biased against African Americans.[11]  For example, "Sheila" [Last Name Unknown ("LNU")], a white co-employee, told plaintiff that Moretti had instructed her (Sheila) to "pay close attention to black customers when they entered the store."[12]  Additionally, Kenyata Mabry, a black co-employee, told plaintiff that Davis had ridiculed her manner of speaking by mocking her dialect.[13]  Plaintiff assumed that Davis "was making fun of the ethnicity in

---

[9]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at Exhibits 17, 26.

[10]Doc. no. 31 (Plaintiff's Evidentiary Submission), Tab 15 at Interrogatory Response #4.

[11]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 146-149.

[12]*Id.* at 148-149.

[13]*Id.* at 28-30, 123-131.  Plaintiff described the circumstances of this event as follows:

> I recall a time where Kenyata . . . was on the phone speaking with Mary Davis.  And Mary thought she had hung up the phone and began to make fun of her speech.
>
> There was a customer at the register at that time, and Kenyata had picked the phone back up and heard Mary doing this and became very upset.  She dropped the phone and just started crying and darted through the department store.
>
> And the customer — well, I asked her before she took off what was wrong with her, and she said they are making fun of me.  And I remember the customer, her expression, she just welled up.  She couldn't believe it.

[Mabry's] voice"; Mabry spoke with a "strong ethnicity.  It's just strong . . . . it's black."[14]  Plaintiff confronted Davis and said, "Kenyata heard you making fun of her."[15]  Davis walked to the sales floor and apologized to Mabry:  "she was telling her she was sorry, she did not mean to make fun of her."[16]  Plaintiff "witnessed the consoling.  They were hugging each other."[17]

After Moretti and Davis terminated Dedra Patrick, another African American co-employee, Ms. Patrick told plaintiff that she "felt [her firing] was racially motivated.  They were trying to get rid of blacks."[18]

Plaintiff spoke with other black employees, including "Candace LNU," "Dianne LNU," and Doris Chambers.  According to plaintiff, "Dianne" stated her belief that "Dillard's practices discrimination against blacks," and "Candace" agreed.[19]

Plaintiff also was dissatisfied with her scheduling.  Moretti, Davis, and

---

Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 28; *see also id*. at 29-30, 125-126.

[14]*Id*. at 129.

[15]*Id*. at 126.

[16]*Id*. at 30.

[17]*Id*. at 126.

[18]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 99-100, 231.

[19]*Id*. at 233-238.  Chambers was allowed to speak to "to her own situation and experience at Dillard's."  *Id*.

plaintiff's direct supervisor, Karen Summers, jointly set plaintiff's work schedule.[20] Moretti and Davis denied plaintiff's requests to be allowed "off work" on specific days on two or three occasions, while Summers denied similar requests an additional two or three times.[21]  However, Brenda Yance, "Sheila LNU," "Nancy LNU," and other "white employees were given days off they requested."[22]

Plaintiff additionally complained of denial of a promotional opportunity.  She informed Moretti and Davis that she desired to be promoted from Sales Associate to Area Sales Manager, or "being higher than what I was."[23]  Moretti and Davis supervised Area Sales Managers, who in turn supervised Sales Associates.[24]  But on at least one occasion defendant hired a new, white employee to fill an Area Sales Manager position instead of promoting plaintiff.[25]

Finally, plaintiff complained of her rate of compensation, but the specific reasons for her generally-stated dissatisfaction are unclear from the record presented to this court.[26]  Regardless, she never lodged a complaint regarding either Moretti or

---

[20]Id. at 118-119.

[21]Id. at 119.

[22]Id. at 31-32, 95, 102, 117-118.

[23]Id. at 81; doc. no. 31 (Plaintiff's Evidentiary Submission), Tab 18, Harris Declaration, ¶ 1.

[24]See doc. no. 29 (Defendant's Evidentiary Submission), Davis Declaration, ¶¶ 6-8, 10-11.

[25]Id., Harris Deposition at 78-79.

[26]Plaintiff earned a base salary of nine dollars and hour when she worked at the Dillard's store in Richmond, Indiana.  Her base salary was $11.25 per hour when she transferred to the Huntsville store.  Plaintiff did not personally know any Sales Associate whose starting salary (or

Davis during her employment in defendant's Huntsville store.[27]

Moretti and Davis terminated plaintiff on January 17, 2001, about four months and one week after she transferred to the Huntsville, Alabama store.[28]  On the date of her termination, plaintiff was assisting a female customer who desired to purchase, among other things, a new handbag.[29]  Plaintiff recommended an expensive "Brahmin Tote bag," and permitted the customer to browse the store with the item at her leisure.[30]  The rub lay in the fact that plaintiff did not work in the store's handbag department.  Two Sales Associates assigned to that department, Jenny Kerness and Leighann Patterson, informed Davis that plaintiff "had come and gotten a $395 [] handbag, taken it with her, said she was showing it to a customer, that he [sic] had a sweater with her as well, and she had not brought it back."[31]  Davis testified that these were unusual circumstances, "in that a sales associate . . . would come out and pick specifically a handbag that expensive and not return it or sell it, that they would just give it to a customer and not better monitor that customer."[32]

---

salary upon transfer) was greater than hers.  Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 223-228.

[27]*Id.* at 251.

[28]*Id.* at Exhibit 26.

[29]*Id.* at 158-159.

[30]*Id.* at 161-164, 193.

[31]Doc. no. 29 (Defendant's Evidentiary Submission), Davis Deposition at 73; *see id.*, Davis Declaration at Exhibit 2.

[32]*Id.*, Davis Deposition at 89-90.

Davis notified Moretti, and then walked to the room in which the store's security monitors were housed.  She attempted to locate the customer carrying the hand bag with the aid of security cameras monitoring all areas of the store's sales floor.[33]  Instead, Davis observed plaintiff leaving the store, and she was carrying a Dillard's shopping bag that appeared to contain a large object.[34]  Plaintiff testified that she had an extra pair of shoes in the bag and was leaving the building for lunch. She proceeded to the customer service counter, where she permitted another employee to inspect her bag and its contents.[35]

Moretti and Davis confronted plaintiff when she returned.  Moretti and a security officer searched plaintiff's automobile with her permission, but failed to find the missing hand bag.[36]  Moretti and Davis then met with plaintiff privately. According to plaintiff, "Moretti [was] very hostile at this point.  And he said I can't terminate you for stealing, but he said I'm going to fire you for [violating] the house

---

[33]*Id.* at 75, 92-94.

[34]*Id.* at 98-100.

[35]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 167-169.  Mary Davis testified that, after observing plaintiff leave the store, she walked to the customer service area and asked employees working there whether Linda Harris had brought a package into the department for inspection, and was told that she had not.  *Id.*, Davis Deposition at 109-10, and Davis Declaration, ¶ 16.  Plaintiff's only response is:  "Admitted to the extent that Davis stated this in her deposition testimony and in her declaration."  Doc. no. 35 (Plaintiff's Brief), ¶¶ 132 & 133 at viii. Davis inspected the "Package Check Shop Log" and observed that plaintiff had made no entries. Plaintiff admits this fact.  *Id.*, ¶ 134.

[36]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 190, 195-203.

packaging rule."[37]

Moretti later completed a "Documentation of Disciplinary Action," stating that plaintiff was fired for violating "Work Rule #19,"[38] which specified that the "house package policy must be carefully observed."[39]  That policy states:

> All employee packages must be properly inspected and sealed prior to leaving the premises.  This includes purchases made at Dillard's other stores, gifts, etc.
>
> All packages must be taken to the designated area to be sealed during the established times.  They will verify the item and receipt match.  Then they will seal the package with security tape.
>
> Employees will not be permitted to take unsealed packages out of the building.[40]

This policy, as implemented at defendant's Madison Square Mall store, also required employees to register the contents of personal packages in a "Package Check Shop Log."[41]  According to Moretti, plaintiff violated the policy in part by failing to register the contents of her bag in that log.[42]

---

[37]*Id.* at 205.

[38]*Id.* at Exhibit 26.

[39]*Id.* at Exhibit 6.

[40]Doc. no. 31 (Plaintiff's Evidentiary Submission), Tab 1 at "Dillards House Package Policy."

[41]Doc. no. 29 (Defendant's Evidentiary Submission), Davis Declaration, ¶ 14.

[42]*Id.*, Harris Deposition at Exhibit 26.  Defendant first reviewed its House Package Policy with plaintiff when she began working at the Dillard's store in Richmond, Indiana.  *See* doc. no. 31 (Plaintiff's Evidentiary Submission), Tab 1 at "Dillards House Package Policy) (signed by plaintiff on August 16, 1999, and February 7, 2000). According to Davis, the Huntsville store also explained the "Package Check Shop Log" to "all new hires (and transfers) during orientation."  Doc. no. 29 (Defendant's Evidentiary Submission), Davis Declaration, ¶ 14.

Plaintiff filed suit against defendant on January 16, 2003, just one day shy of the second anniversary of her termination.[43]   In her second amended complaint, plaintiff alleged that she "has been intentionally discriminated against on the basis of race and color in regard to termination, promotion, job assignments and other adverse terms and conditions of employment, and has been retaliated against in violation of 42 U.S.C. § 1981."[44]   Plaintiff also alleged that she had been  "subjected to a racially hostile work environment as a result of defendant's actions . . . ."[45]   Finally, plaintiff alleged that defendant negligently and/or maliciously trained, supervised, and retained Moretti and Davis.[46]

Plaintiff argues that one additional fact is relevant to her claims.  Defendant terminated Moretti in July 2002, eighteen months after he and Davis fired plaintiff. Moretti confronted an African American woman whom he suspected of being a

---

Defendant and plaintiff understood the requirements of the "Package Check Shop Log" policy differently.  According to Mary Davis, "each employee must . . . enter on the Package Check Shop Log the contents of the package with which they are about to leave the store.  The employee is to enter the contents of the bag on the log regardless of whether the items in the package are Dillard's merchandise, merchandise purchased at other stores in the mall, or personal items not purchased at any of the stores in the mall." *Id.*, Davis Declaration, ¶ 14.  Plaintiff, however, believed that the "Package Check Shop Log" applied only when she wanted to leave her personal possessions with store attendants while she worked on the sales floor.  *Id.*, Harris Deposition at 173.

Defendant and plaintiff also disagreed on whether plaintiff had affixed security tape on her bag as required under the house package policy.  Plaintiff testified that the inspecting employee "put tape on the back" of her bag.  *Id.* at 169.  Moretti claimed otherwise.  *Id.* at Exhibit 26.

[43]Doc. no. 1 (complaint).

[44]Doc. no. 8 (second amended complaint), ¶ 19.

[45]*Id.*, ¶ 20.

[46]*Id.*, ¶¶ 22-27.

shoplifter, and pulled a knife from his pocket, allegedly to defend himself when the woman reached into her hand bag.[47]   According to Davis, this incident led to Moretti's termination.[48]

## II. DISCUSSION

Plaintiff commenced this action on January 16, 2003, one year and 364 days following her discharge, but her original complaint was not served upon defendant. Indeed, plaintiff did not attempt to serve defendant until some date after her amended complaint was filed on April 18, 2003.  For such reasons, defendant's primary line of defense to all but one of plaintiff's claims is the statute of limitations.  For example, defendant argues:

> The statute of limitations for section 1981 claims is the same as the state statute of limitations for personal injury claims. *Baker v. Gulf & Western Indus., Inc.*, 850 F.2d 1480, 1482 (11th Cir. 1988).  In Alabama, the statute of limitations for personal injury claims is two years. *Alabama Code* § 6-2-38.  Thus, a plaintiff making a claim under § 1981 must file her complaint within two years of the alleged discriminatory act. *Lufkin v. McCallum*, 956 F.2d 1104, 1105 (11th Cir. 1992) (holding that the statute of limitations for § 1983 civil rights actions is based upon Alabama's personal injury statute, which is two years), *cert. denied*, 506 U.S. 917 (1992); . . . .

> Plaintiff's claims based on a denied promotion, or a denied request for a vacation day, or discrimination in her initial rate of pay are all discrete acts and therefore the statute of limitations begins to run when the alleged discriminatory act occurs.  *See National Railroad*

---

[47]Doc. no. 29 (Defendant's Evidentiary Submission), Davis Deposition at 30-40.
[48]*See id.*

11

*Passenger Corp. v. Morgan*, 122 S. Ct. 2061, 2068 (2002) (statute of limitations "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period."). Harris filed this lawsuit on January 16, 2003. Given the two year statute of limitations for her negligence claims and her claims under § 1981, any claim for alleged wrongful acts that occurred before January 16, 2001 are time-barred. Plaintiff has not pointed to any alleged discriminatory or wrongful actions that occurred on January 16 or 17 of 2001, other than her discharge. All other claims must be dismissed as untimely.

Doc. no. 30 (Defendant's Brief), at 1-2 (some citations omitted). Defendant is correct, but only in part. Like the Maginot Line that provided pre-war France with a false sense of security from the German Army, the statute of limitations is not an impregnable barrier.

## A.   The State of Limitations Applicable to Claims Based Upon § 1981

Section 1981, like many other federal statutes (*e.g.*, 42 U.S.C. §§ 1982, 1983), does not contain a specific statute of limitations. In such circumstances,[49] the Supreme Court traditionally has instructed district courts to "select the most appropriate or analogous state statute of limitations." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660, 107 S. Ct. 2617, 2620, 96 L. Ed. 2d 572 (1987). In Alabama, that limitations period is two years. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (citing Alabama Code § 6-2-38(l) for the proposition that

---

[49]The Supreme Court has described Congress' frequent failure to enact specific statutes of limitation as a "void which is commonplace in federal statutory law." *Board of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980).

§ 1981 claims arising out of acts occurring in Alabama are governed by the state's general, two-year limitations period); *see also Goodman*, 482 U.S. at 661-664, 107 S. Ct. at 2620-2622 (holding that the court of appeals correctly applied Pennsylvania's two year statute of limitations for personal injury actions to § 1981 claims).

This general rule was limited to some extent on December 1, 1990, however, when Congress created a "catchall" four-year statute of limitations that applies to civil actions arising under federal statutes enacted after the effective date of that statute, but not containing a specific statute of limitations. *See* 28 U.S.C. § 1658; *see also North Star Steel Co. v. Thomas*, 515 U.S. 29, 34, 115 S. Ct. 1927, 1930, 132 L. Ed. 2d 27 (1995) (describing § 1658 as "a general, 4-year limitations period for any federal statute subsequently enacted without one of its own"). Precisely, the statute states that, "[e]xcept as otherwise provided by law, a civil action arising under *an Act of Congress enacted after the date of the enactment of this section* may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658(a) (emphasis supplied).[50]

Thus, a question can arise, as here, as to which tolling provision applies to

---

[50]Congress amended § 1658 in 2002, to add a separate provision (designated subsection (b)) specifying the state of limitations for certain claims under the securities laws. *See* Corporate and Criminal Fraud Accountability Act of 2002, Pub.L. 107-204, § 804(a), 116 Stat. 801. The original language of § 1658 quoted above was not changed, but re-designated subsection (a).

claims asserted under 42 U.S.C. § 1981:  the two-year limitation period borrowed from Alabama law, or the four-year period prescribed by 28 U.S.C. § 1658(a).  The answer is not as precise as one might hope, and requires historical analysis.

### 1.    The language of § 1981 prior to the Civil Rights Act of 1991

The statutory language now codified at 42 U.S.C. § 1981(a) was originally enacted as part of the Civil Rights Act of 1866.  It was amended in minor respects in 1870, and recodified in 1874.  *See Runyon v. McCrary*, 427 U.S. 160, 168-69 n.8, 96 S. Ct. 2586, 2594 n.8, 49 L. Ed. 2d (1976); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436-37, 88 S. Ct. 2186, 2201-02, 20 L. Ed. 2d 1189 (1968).  Congress most recently amended the statute in 1991.  Prior to that year, § 1981 contained only one paragraph, reading as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The Supreme Court interpreted the original language of § 1981 narrowly in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989), holding that it did not protect against racial-harassment or other discrimina-tory conduct that occurred after the formation of a contract of employment.  *See id.*

at 171, 109 S. Ct. at 2369 (holding that § 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations").  Instead, the statute was construed as only "prohibit[ing] racial discrimination in the making and enforcement of private contracts."  *Id*. at 172, 109 S. Ct. at 2370.

> The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.

*Id*. at 176-77, 109 S. Ct. at 2372-73.[51]  *See also*, *e.g.*, *Jones v. R.R. Donnelley & Sons Co.*, 124 S. Ct. 1836, 1846 (2004) (holding that African American plaintiffs did not enjoy the right to assert hostile work environment, wrongful termination of employment, or failure-to-transfer claims under the pre-1991 version of § 1981);[52]

---

[51]As the *Patterson* Court noted,

> [i]nterpreting § 1981 to cover postformation conduct unrelated to an employee's right to enforce his or her contract, such as incidents relating to the conditions of employment, is not only inconsistent with that statute's limitation to the making and enforcement of contracts, but would also undermine the detailed and well-crafted procedures for conciliation and resolution of Title VII claims.  . . .

*Patterson*, 491 U.S. at 180, 109 S. Ct. at 2374.

[52]Specifically, the Court in *Jones* held that, "[b]ecause petitioners' hostile work environment,

*Busby v. City of Orlando*, 931 F.2d 764, 771 n.6 (11th Cir. 1991) (§ 1981 "limited to

actions for *refusal to enter into* a contract because of race," and did not apply to race

discrimination claims arising *during* a plaintiff's employment) (emphasis in original).

It is important to notice, however, that the *Patterson* Court also held that *some*

failure-to-promote claims *were actionable* under the pre-1991 version of § 1981.

> Petitioner's claim that respondent violated § 1981 by failing to
> promote her, because of race, to a position as an intermediate accounting
> clerk is a different matter. . . . [T]he question [of] whether a promotion
> claim is actionable under § 1981 depends upon whether the nature of the
> change in position was such that it involved the opportunity to enter into
> a new contract with the employer.  If so, then the employer's refusal to
> enter the new contract is actionable under § 1981. . . . Only where the
> promotion rises to the level of an opportunity for *a new and distinct
> relation between the employee and the employer* is such a claim
> actionable under § 1981.  *Cf. Hishon v. King & Spalding*, 467 U.S. 69,
> 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984) (refusal of law firm to accept
> associate into partnership) (Title VII).

*Patterson*, 491 U.S. at 185-86, 109 S. Ct. at 2377 (emphasis added).[53]

---

wrongful termination, and failure-to-transfer claims did not allege a violation of the pre-1990 version
of § 1981 but did allege violations of the amended statute, those claims 'ar[ose] under' the
amendment to § 1981 contained in the 1991 Act."  *Jones v. R.R. Donnelley & Sons Co.*, 124 S. Ct.
1836, 1846 (2004).

[53]The Eleventh Circuit applied *Patterson's* "new and distinct relation" test in *Wall v. Trust
Company of Georgia*, 946 F.2d 805 (11th Cir. 1991).  The African American plaintiff worked for
the defendant as a "customer service representative," but applied for the newly-created position of
"tax analyst."  *Id.* at 806-807.  The position was instead awarded to a white candidate, and plaintiff
sued under both Title VII and § 1981.  *Id.* at 807-808.  The district court entered partial summary
judgment in favor of the employer on plaintiff's § 1981 claim, concluding that a promotion from
customer service representative to tax analyst did not constitute a "new and distinct contractual
relationship."  The Eleventh Circuit affirmed, saying:

> The customer service representative and tax analyst positions are both nonexempt

## 2.    The language of § 1981 as amended by the Civil Rights Act of 1991

Congress overturned the Supreme Court's *Patterson* decision on November 21, 1991, when it enacted the Civil Rights Act of 1991.  *See* Pub.L. No. 102-166, Title I, § 101, 105 Stat. 1071 (1991).  The amendatory Act designated the preexisting language of § 1981 as § 1981(*a*), and added two new subsections.  The first new subsection defined the key phrase "make and enforce contracts" as including "the making, performance, modification, *and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship*."  42 U.S.C. § 1981(b) (emphasis supplied).[54]  The Supreme Court subsequently recognized

---

salaried jobs, are relatively equal in grade (118 versus 119), provide identical benefits and compensation, and are covered by the same policies and procedures. *Specifically, the change would not have involved the elevation of* [plaintiff] *to a management position which could be considered a new contract*, analogous to the change in status in *Hishon*, cited by means of example in *Patterson*.

*Wall*, 946 F.2d at 808 (emphasis supplied) (citations omitted).

[54]The current version of § 1981 reads as follows:

    **(a) Statement of equal rights**.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

    **(b) "Make and enforce contracts" defined**.  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

    **(c) Protection against impairment**.  The rights protected by this section are

that the 1991 amendment "enlarged the category of conduct that is subject to § 1981 liability." *Rivers v. Roadway Express*, 511 U.S. 298, 303, 114 S. Ct. 1510, 1515, 128 L. Ed. 2d 274 (1994).

Again, it is important to notice that the amendments to § 1981 worked by the Civil Rights Act of 1991 made *all* failure-to-promote claims actionable under the statute — not just those which rose "to the level of an opportunity for *a new and distinct relation between the employee and the employer*." *Patterson*, 491 U.S. at 185, 109 S. Ct. at 2377. *See, e.g., Goodgame v. American Cast Iron Pipe Company*, 75 F.3d 1516, 1518 (11th Cir. 1996) (citing 42 U.S.C. § 1981(b)) (holding that the post-1991 amended version of § 1981 is "applicable to all promotion claims.").

### 3.   The effect of 28 U.S.C. § 1658(a) upon 42 U.S.C. § 1981

The Supreme Court recently addressed the implications of § 1658(a) for § 1981 claims in *Jones v. R.R. Donnelley & Sons Co.*, 124 S. Ct. 1836 (2004), and concluded that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990 — and therefore is governed by § 1658's 4-year statute of limitations — if the plaintiff's claim against the defendant *was made possible by a post-1990 enactment*." *Id*. at 1845 (emphasis supplied) (bracketed alteration in original). Applying that test, the Supreme Court held that the hostile work environment, wrongful termination, and

---

protected against impairment by nongovernmental discrimination and impairment under color of State law.

failure-to-transfer claims of the African American plaintiffs in *Jones*

> "ar[ose] under" the 1991 Act *in the sense that petitioners' causes of action were made possible by that Act.  Patterson* held that "racial harassment relating to the conditions of employment is not actionable under § 1981."  491 U.S., at 171, 109 S. Ct. 2363 (emphasis added).  The 1991 Act overturned *Patterson* by defining the key "make and enforce contracts" language in § 1981 to include the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  In *Rivers v. Roadway Express, Inc.*, we recognized that the 1991 amendment "enlarged the category of conduct that is subject to § 1981 liability," 511 U.S., at 303, 114 S. Ct. 1510, and we therefore held that the amendment does not apply "to a case that arose before it was enacted," *id.*, at 300, 114 S. Ct. 1510.  Our reasoning in *Rivers* supports the conclusion that the 1991 Act fully qualifies as "an Act of Congress enacted after [December 1, 1990]" within the meaning of § 1658.  *Because petitioners' hostile work environment, wrongful termination, and failure-to-transfer claims did not allege a violation of the pre-1990 version of § 1981 but did allege violations of the amended statute*, those claims "ar[ose] under" the amendment to § 1981 contained in the 1991 Act.

*Jones*, 124 S. Ct. at 1845-46 (emphasis added) (bracketed alterations in original).

Thus, even following the enactment of § 1658, it sometimes becomes important to determine whether a particular plaintiff's claim is one that could have been brought under the pre-1991 version of § 1981, in order to determine the applicable statute of limitations.  This is such a case; and this court concludes that only plaintiff's failure-to-promote claim is barred by the two year statute of limitations borrowed from Alabama law.

### 4.       Plaintiff's failure-to-promote claim

Defendant employed plaintiff as a "Sales Associate."  Her duties included assisting customers select merchandise and arranging merchandise for display.[55] Plaintiff sought promotion to the position of "Area Sales Manager."[56]  Area Sales Managers directly supervised Sales Associates.[57]  They also assisted the store's Manager and Operations Manager to establish the work schedules of Sales Associates working under their supervision,[58] and had authority to otherwise "run [the] department."[59]  In addition, while it was acceptable for a Sales Associate to resign during the holiday period for personal reasons, it was unacceptable for an Area Sales Manager to do the same thing.[60]  From plaintiff's perspective, a promotion to Area Sales Manager would have put her "higher than what I was."[61]

---

[55]*See* doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 125, 158-164.

[56]Doc. no. 31 (Plaintiff's Evidentiary Submission), Tab 18, Harris Declaration, ¶ 1.

[57]*See* doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 78, 81 (plaintiff testified that Area Sales Manager Karen Summers directly supervised her.  Plaintiff sought promotion to Summers' position after Summers' departure).

[58]*See* doc. no. 31 (Plaintiff's Evidentiary Submission), Tab 18, Harris Declaration, ¶ 5 (Plaintiff testified that "my [Area Sales Manager] may have scheduled me weekdays off, but only incidentally and never at my request."); doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 93 (Plaintiff testified that Area Sales Manager Karen Summers, with Moretti's and Davis's supervision, helped set plaintiff's work schedule).  *See also id*, Davis Declaration, ¶¶ 6-11 (description of Area Sales Manager responsibilities, and identification of Karen Summers as an Area Sales Manager).

[59]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 84.

[60]*Id.* at 84-85.

[61]*Id.* at 81.

Thus, a promotion from Sales Associate to Area Sales Manager would have "involved the elevation of [plaintiff] to a management position which could be considered a new contract . . . ." *Wall v. Trust Company of Georgia*, 946 F.2d 805, 808 (11th Cir. 1991).[62]  Stated differently, plaintiff could have brought her failure-to-promote claim under the original version of § 1981, prior to its amendment by the Civil Rights Act of 1991, pursuant to that portion of the the Supreme Court's decision in *Patterson* holding that promotions which rose "to the level of an opportunity for *a new and distinct relation between the employee and the employer*" were actionable under the original statutory language of § 1981.  *Patterson*, 491 U.S. at 185, 109 S. Ct. at 2377.

In summary, Alabama's two year statute of limitation applies to plaintiff's failure-to-promote claim, not the four-year period provided by 28 U.S.C. § 1658(a). Plaintiff filed suit on January 16, 2003, just one day shy of the second anniversary of her termination.  Plaintiff could neither admit nor deny that defendant opened or filled any promotion opportunities after January 15, 2001.[63]  Plaintiff therefore has not established that defendant unlawfully failed to promote her within the applicable statute of limitations, and the claim is time barred.[64]

---

[62]*See supra* note 55 for a more complete discussion of the *Wall* decision.

[63]Doc. no. 35 (Plaintiff's Brief), page "xxx," ¶ 58.

[64]Even if this court should be wrong in concluding that a two year statute of limitations applies to plaintiff's failure-to-promote claim, defendant still is entitled to summary judgment on that

## B.    Abandoned Claims

Plaintiff alleged in her amended complaint that she "has been intentionally discriminated against on the basis of race and color in regard to . . . job assignments and other adverse terms and conditions of employment . . . in violation of 42 U.S.C. § 1981."[65]   This language constitutes the basis for her claims that defendant discriminated against her with regard to pay, and, when denying her scheduling requests.  Plaintiff did not argue these claims in her brief opposing defendant's motion for summary judgment, however.

Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in

---

issue.  Plaintiff did not argue her promotion claim in the brief she submitted in opposition to defendant's motion for summary judgment.  For that reason, which will be discussed more thoroughly in the following section, plaintiff is deemed to have abandoned the claim.

[65]Doc. no. 8 (second amended complaint), ¶ 19.

opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned . . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).[66]

The court has, nevertheless, examined defendant's contentions with regard to plaintiff's pay and scheduling claims; finds those arguments to be well reasoned and supported by the record; and, accordingly, adopts Parts III(D) and (E) of defendant's initial brief in support of its motion for summary judgment[67] as the opinion of this court on those issues.

---

[66]*Cf., e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).

[67]Doc. no. 30.

**C.    Discriminatory Discharge**

Plaintiff claims that Moretti and Davis fired her because of her race, in violation of 42 U.S.C. § 1981.  As discussed above, the Civil Rights Act of 1991 broadened the scope of the statutory phrase "make and enforce contracts" to include the "termination of contracts," thus making claims of wrongful termination actionable under the statute.  *See*, *e.g.*, *Jones v. R.R. Donnelley*, 124 S. Ct. at 1845-1846.

Section 1981 generally is described as "a parallel remedy against [racial] discrimination which . . . derive[s] its legal principles from Title VII."  *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).[68]  In other words, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also*, *e.g.*, *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When section 1981 is used as a parallel basis for relief with Title VII against disparate treatment in employment, its elements appear to be identical.") (citations omitted).

Section 1981 claims, like Title VII claims, require proof that an employer intentionally discriminated against an employee on the basis of her race.  *See*, *e.g.*,

---

[68]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

*Brown v. American Honda Motor Company, Inc.*, 939 F.2d 946, 949 (11th Cir. 1991).

Plaintiff has presented only circumstantial evidence on this issue; accordingly, the court will analyze her claim under the *McDonnell Douglas* burden-shifting framework. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Rojas v. State of Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002); *Brown*, 939 F.2d at 949 ("[T]he test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases. . . . Under the familiar *McDonnell Douglas/Burdine*[69] framework, the court employs a three part test designed to determine the motivation of the defendant in taking the challenged action.") (citations omitted).

In the Eleventh Circuit, "a plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if [she] shows that [she] is a member of a protected class, that [she] was qualified for the job from which [she] was fired, and 'that the misconduct for which [she] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'" *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (quoting *Davin v. Delta Airlines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B

---

[69]*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

1982)[70]).  "When an individual proves that [she] was fired but one outside [her] class was retained although both violated the same work rule, this [gives rise to a presumption] that the rule was discriminatorily applied against that individual, regardless of the race or sex of the replacement."  *Nix*, 738 F.2d at 1186; *see also McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282-84, 96 S. Ct. 2574, 2579-80, 49 L. Ed. 2d 493 (1976) (holding that an employer would violate Title VII if it fired black employees who participated in a theft of cargo while retaining white employees guilty of the same offense).

Plaintiff failed to submit evidence supporting a *prima facie* case.  While she testified during deposition about observing "white employees carrying their own personal *pocketbooks*" out of Dillard's Madison Square Mall store in violation of defendant's house package policy,[71] she failed to identify any of those employees or, more significantly, to establish that any supervisor was aware of the alleged violations.  *See, e.g., Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989) (holding that a plaintiff may not make out *prima facie* case of discrimination by relying on evidence that other employees committed similar misconduct, but were not

---

[70]In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of the Unit B panel of the former Fifth Circuit handed down after September 30, 1981.

[71]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 218 (emphasis supplied).

subjected to the same discipline, if supervisors were unaware of the other violations).

Plaintiff, nevertheless, argues that she can establish a *prima facie* case by an alternate method of proof: *i.e.*, by demonstrating that she did not violate defendant's house package policy.  Plaintiff cites *Jones v. Gerwens*, *supra*, as support for this argument:

> Disparate treatment can be shown by methods other than a comparator. In order to show discriminatory discipline, plaintiff can show *either* that she did not violate the work rule *or* that he or she engaged in misconduct similar to that of a person outside the protected class and the disciplinary measures enforced against him or her were more severe than those who engaged in similar misconduct.

Doc. no. 35 (Plaintiff's Brief), at 2 (emphasis supplied).  Plaintiff's reliance upon *Jones v. Gerwens* is misplaced.  That case involved a black police officer who was suspended as discipline for unauthorized use of a police vehicle, while white police officers who allegedly had committed similar offenses received less severe (or no) discipline.  The Eleventh Circuit panel in *Gerwins* held that,

> in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show *either* (a) *that he did not violate the work rule*, *or* (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Jones v. Gerwens*, 874 F.2d at 1540 (emphasis supplied).  The emphasized portion

of this holding subsequently was questioned in *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306 (11th Cir. 1998), a case involving a black, female, licensed practical nurse who was discharged for violation of work rules (*i.e.*, failing to wear required uniform to work, and failing to follow a supervisor's instructions), while white employees allegedly were treated more favorably for similar misconduct.  The *Bessemer Carraway* Court wrote:

> Considering the facts in *Jones* [*v. Gerwens*], our impression is that words about "did not violate the work rule" are unnecessary to the decision in *Jones* and are dicta; but we will discuss them.  The pertinent words in *Jones* demand not two, but three elements:  (1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged — *either* (a) *disputedly or* (b) *admittedly* — in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.
>
> We stress that, under the *Jones* [*v. Gerwens*] formulation, no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule.  The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better.

*Bessemer Carraway*, 137 F.3d at 1311 n.6 (emphasis supplied).

In other words, plaintiff still must demonstrate that a similarly situated white employee received different, and more favorable, treatment after violating the "Package Check Shop Log" requirement of defendant's house package policy.  She

has not done so.  Accordingly, defendant is entitled to summary judgment on plaintiff's discriminatory discharge claim.

## D.    Retaliation

Plaintiff contends that defendant fired her for engaging in a statutorily protected expression, in violation of § 1981.  Even though the text of 42 U.S.C. § 1981 does not contain a specific prohibition against retaliation, the Eleventh Circuit has held that retaliation claims asserted in the context of a complaint of racial discrimination, and arising after the effective date of the Civil Rights Act of 1991, generally are cognizable under the statute.  *See, e.g., Webster v. Fulton County, Georgia*, 283 F.3d 1254, 1256 (11th Cir. 2002) (holding that "[w]e have previously concluded that Section 1981 supports a retaliation cause of action") (citing *Andrews v. Lakeshore Rehabilitation Hospital*, 140 F.3d 1405, 1409-13 (11th Cir. 1998)).

In the absence of direct evidence of an intent to retaliate against an employee who engaged in protected expression, § 1981 requires a plaintiff to comply with the *McDonnell Douglass* analytical framework in order to survive a motion for summary judgment.  *See Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis); *Moss v. W & A Cleaners*, 111 F. Supp. 2d 1181 (M.D. Ala. 2000); *Holiness v. Moore-Handley, Inc.*,

114 F. Supp. 1176, 1185 (N.D. Ala. 1999).

A plaintiff must satisfy three elements to establish a *prima facie* case of retaliation:  (1) she engaged in statutorily protected expression;[72] (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.  *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002); *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001) (Title VII); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (Title VII); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (Title VII and § 1981).

In the brief plaintiff submitted in opposition to summary judgment, plaintiff asserts that, "[t]aken as a whole, the actions which occurred *after Ms. Harris engaged in protected activity in January 2001* create factual issues of disparate treatment and hostile work environment."[73]  Plaintiff does not clearly specify the nature of her "protected activity," but she appears to be referring to one of two incidents, occurring on January 17 and 30, 2001, respectively.   Steve Moretti completed a

---

[72]"Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment [or other unlawful employment practices]." *Johnson v. Booker T. Washington Broadcasting Serv.*, 234 F.3d 501, 507 (11th Cir. 2000) (citing *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).

[73]Doc. no. 35 (Plaintiff's Brief), at 9 (emphasis supplied).

"Documentation of Disciplinary Action" on January 17, 2001, stating his reasons for terminating plaintiff. Plaintiff objected to her termination on the back of this form, stating: "Many associates have complained of unfair treatment by Dillard's management[;] this is another example."[74] Plaintiff also appears to argue that she engaged in "protected activity" when she filed an application for unemployment compensation benefits with the Indiana Department of Workforce Development on January 30, 2001, thirteen days after her termination. Plaintiff stated in her application that "I felt I was treated unfairly and wrongfully terminated" by defendant, thus warranting unemployment benefits.[75] In her brief opposing summary judgment, plaintiff characterized these two incidents as follows: "[plaintiff] complained to management in writing on her termination form on January 17, 2001"; and, "[d]efendant was notified again when [plaintiff] filed her unemployment claim in Indiana."[76]

---

[74]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at Exhibit 26.

[75]*Id.* at Exhibit 30. Plaintiff filed an "interstate claim" to recover unemployment compensation in Indiana for her termination which occurred in Huntsville, Alabama.

[76]Doc. no. 35 (Plaintiff's Brief), ¶ 175 at xxxviii. Obviously, the court cannot be absolutely certain that either the January 17 or January 30 incident is the "protected activity in January 2001" which plaintiff speaks of in her brief opposing summary judgment. However, the context in which plaintiff raises these facts leads the court to believe that one of them is so. Defendant submitted a statement of facts as part of its brief in support of its motion for summary judgment. In paragraph 174, defendant averred that plaintiff "never made any complaints to any members of management that she felt she was subjected to discriminatory conduct during the time she worked at Dillard's." Doc. no. 30 (Defendant's Brief), ¶ 174 at xxiv. In paragraph 175, defendant stated that "the first time plaintiff notified Dillard's management that she felt she was being discriminated against was with the filing of her lawsuit, almost two years to the date after her termination." Based on these

Plaintiff's objections on January 17 and January 30, 2001 cannot qualify as "protected expression," because each *followed* plaintiff's termination.  The third element of a *prima facie* retaliation claim requires plaintiff to demonstrate a causal linkage between her protected expression and the adverse employment action taken in response to her protected conduct.  This is impossible to do when, as in this case, defendant terminated plaintiff *before* plaintiff complained of "unfair treatment."  In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit held that a female radio program host could not prevail on a retaliation claim when the defendant's alleged retaliatory actions — changing plaintiff's shifts, cutting her pay and, ultimately, terminating her employment — all occurred *before* she filed an EEOC charge and complained to station managers about her male co-host's alleged sexual harassment.

> Johnson engaged in statutorily protected expressions by filing a charge with the EEOC in June 1997 and complaining about Donnell's harassment to Walker and Balton on June 6, 1997.  Johnson's employment with WENN ended on May 28, 1997.  Thus, Johnson's June 1997 protected expressions occurred after her employment ended in May 1997, and WENN's employment decisions could not have been

---

facts, defendant argued that plaintiff never engaged in "protected activity" during the time she worked at Dillard's, and, therefore, could not establish a *prima facie* case of retaliation.  Doc. no. 30 (Defendant's Brief), at 13.  In her brief opposing summary judgment, plaintiff disputed these specific paragraphs (174 and 175) undergirding defendant's argument.  Plaintiff stated that she in fact complained to defendant about its discriminatory practices.  She "complained to management in writing on her termination form on January 17, 2001."  "Defendant was notified again when [plaintiff] filed her unemployment claim in Indiana," on January 30, 2001.  Doc. no. 35 (Plaintiff's Brief), ¶¶ 174-175 at xxxviii.

based on Johnson's protected expressions.   Hence Johnson cannot prevail on her retaliation claim, as she failed to satisfy the third [element of a *prima facie* case]:  a causal relationship between her complaining about Donnell's harassment and her transfers or termination.

*Id*. at 507.

This court has scoured the record and finds no factual basis for any other event which may qualify as, in plaintiff's less than precise descriptive phrase, "protected activity in January 2001."  Of course, plaintiff did inform Mary Davis that Kenyata Mabry had overheard Davis mocking her manner of speaking.  Nevertheless, neither the evidentiary submissions nor the briefs submitted by the parties precisely peg the date on which this incident occurred.   The obvious problem that arises from a plaintiff's failure to specify *when* protected activity occurs is that there is no way to gauge its proximity to the adverse employment action complained of.   "[A] close temporal proximity between two events *may* support a finding of a causal connection between those two events."  *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (emphasis supplied) (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."); *see also, e.g.*, *Bass v. Board of County*

33

*Commissioners,* 256 F.3d 1095, 1119 ("Close temporal proximity between the protected activity and the adverse action *may be* sufficient to show that the two were not wholly unrelated.") (emphasis supplied) (citing *Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)).

The Supreme Court has indicated, however, that the temporal distance between events must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273-274, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). The *Breeden* Court favorably cited cases from the Seventh and Tenth Circuits which concluded that temporal gaps of three or four months are *not* sufficiently connected to serve as circumstantial evidence of a causal relationship between two events. *Id.* at 273-274, 121 S. Ct. at 1511.[77]

Of course, plaintiff's confrontation of Mary Davis had to occur sometime

---

[77]In full text, the Supreme Court's statement in *Breeden* is as follows:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001). *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Id.* at 273-274, 121 S. Ct. at 1511.

during the approximate, four-month duration of her employment in defendant's Madison Square Mall store. The temporal gap between plaintiff's protected activity and her termination, therefore, may have been as great as three to four months (which is not actionable), or as close as one or two months (which is). Unquestionably, when considering a motion for summary judgment, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-moving party, and, to resolve all reasonable doubts in that party's favor. *See*, *e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). That is the circumstance facing this court as a result of plaintiff's failure to specify the date on which she confronted Mary Davis.

For all of these reasons, defendant's motion for summary judgment on plaintiff's retaliation claim is due to be granted.

35

**E.     Racially Hostile Work Environment**

Plaintiff also alleges that defendant subjected her to a racially hostile work environment, in violation of 42 U. S. C. § 1981.  The discussion in Part II(A) of this opinion *supra* should make clear that § 1981, as amended by the Civil Rights Act of 1991, now encompasses claims for a racially hostile work environment.  *See also*, *e.g.*, *Jackson v. Motel 6 Multipurpose, Inc.* 130 F.3d 999, 1008 n.17 (11th Cir. 1997) (citing *Vance v. Southern Bell Telephone & Telegraph Co.*, 983 F.2d 1573, 1575 (11th Cir. 1993) (observing that the 1991 amendments enlarged the scope of § 1981 to include post-hiring discrimination); *Dennis v. County of Fairfax*, 55 F.3d 151, 155 (4th Cir. 1995) (holding that § 1981, as amended in 1991, now covers "general conditions of employment, including incidents of racial discrimination in the workplace"); *Johnson v. Uncle Ben's Inc.*, 965 F.2d 1363, 1372 (5th Cir. 1992) ("Under § 1981 as amended by the [1991] Act, racial discrimination and other discrimination in an employment relation occurring after contract formation is actionable.")).

The elements of a racially hostile work environment claim are the same, regardless of whether the claim is viewed through the lens of Title VII or § 1981.  *See Vance,* 863 F.2d at 1509 n.3 ("[T]he legal elements of a disparate treatment claim are identical under Title VII and § 1981.") (citing *Lincoln v. Board of Regents of the*

36

*University System of Georgia*, 697 F.2d 928, 935 n.6 (11th Cir. 1983) ("When . . . the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981.")).

"In order to prove a claim for a racially hostile work environment, a plaintiff must 'demonstrate that the actions of the defendants altered the conditions of the workplace, creating an objectively abusive and hostile atmosphere.'" *Jackson v. Motel 6*, 130 F.3d at 1008 n.17 (quoting *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995)); *see also*, *e.g.*, *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (holding in the context of a suit brought by a Mexican-American plaintiff that a national origin "hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

A prima facie racially hostile work environment case has five elements: (1) the plaintiff is African American, the class of persons protected by § 1981; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based upon her race; (4) the harassment was sufficiently severe or pervasive to alter the

terms or conditions of employment and created a discriminatorily abusive working environment; and (5) the employer is responsible under a theory of either direct or vicarious liability. *See, e.g., Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994). *Cf. Miller,* 277 F.3d at 1275 (harassment based on the plaintiff's national origin); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982) (sexual harassment).

Plaintiff argues that the following evidence supports her hostile work environment claim:  (1) Steve Moretti instructed "Sheila" to pay close attention to black customers; (2) eighteen months after plaintiff's termination, Moretti was himself fired for using a pocket knife "to apprehend a black customer [suspected of shoplifting] in the mall area outside the store"; (3) Mary Davis and Moretti "immediately suspected and accused [plaintiff] of theft" when they could not find the missing tote bag; (4) Moretti, Davis, and Karen Summers denied plaintiff's scheduling requests, but accommodated similar requests of white employees; (5) Davis mocked Kenyata Mabry's speech; (6) Dedra Patrick believed that Moretti and Davis terminated her because of her race; and (7) "Dianne, Candace, Doris, Kenyata, all African-American employees . . . discussed their experiences of racial discrimination at Dillard's with [plaintiff]."[78]

---

[78]Doc. no. 35 (Plaintiff's Brief), at 8-9.

Before discussing the merits of plaintiff's *prima facie* case, the court must separate admissible from inadmissible evidence.  When considering a motion for summary judgment, "a court may only consider evidence that is admissible or that could be presented in admissible form" at trial.  *Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) (citing *Prichard v. Southern Company Services*, 92 F.3d 1130, 1135 (11th Cir. 1996) (holding that a plaintiff "cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial") (in turn citing *McMillian v. Johnson*, 88 F.3d 1573, 1583-84 (11th Cir. 1996) (same)).

Federal Rule of Civil Procedure 56(e) requires that "supporting and opposing affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence . . . ."  Fed. R. Civ. P. 56(e).  "This rule also applies to testimony given on deposition."  *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (citing *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 570 n.4 (7th Cir. 1989)).  Thus, "[t]he general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'"  *Macuba*, 193 F.3d at 1322 (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990).  "Some courts, including [the Eleventh Circuit], appear to have restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for summary judgment

if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" *Macuba*, 193 F.3d at 1323.  The *Macuba* panel explained:

> We believe that the courts have used the phrases "reduced to admissible evidence at trial" and "reduced to admissible form" to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

*Id.* at 1323-24 (footnotes omitted).

### 1.    Moretti's direction to "Sheila," to pay close attention to African American customers

"Sheila LNU" told plaintiff that Moretti had instructed her ("Sheila") to "pay close attention to black customers."  There are three layers to this proffered utterance, from which plaintiff would ask a fact-finder to infer that defendant's store manager harbored a racial animus against African Americans:  (1) Moretti's instruction to Sheila; (2) Sheila's statement to plaintiff, recounting her understanding of Moretti's instruction; and (3) plaintiff's recollection of what Sheila told her that Moretti had said.  Each layer must be separately analyzed for admissibility.

> Under the federal rules, "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."  Fed.R.Evid. 805; *see U.S. v. Pendas-Martinez*, 845 F.2d 938, 942-43 (11th Cir.

1988) (both levels of hearsay must be excepted from the hearsay rule). In a factual situation very similar to that here, the Third Circuit Court of Appeals decided that the plaintiff's testimony that his supervisor told him that "they [presumably meaning unidentified superiors of the supervisor at the company] wanted a younger person" was inadmissible double hearsay because there was no basis for admitting the statement that "they" made. *Carden v. Westinghouse Electric Corp.*, 850 F.2d 996, 1002 (3d Cir. 1988). The Eighth Circuit Court of Appeals reached the same conclusion in *Cedeck v. Hamiltonian Federal Savings & Loan Association*, 551 F.2d 1136 (8th Cir. 1977).

*Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456-57 (11th Cir. 1997).

If "Sheila" testified at trial that Moretti had so instructed her, then his out-of-court statement arguably would be admissible against defendant as a vicarious admission under Federal Rule of Evidence 801(d)(2)(D), which provides that "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," is "not hearsay."

Even so, "Plaintiff's Final Witness and Exhibit List," filed in accordance with this court's scheduling order,[79] establishes that "Sheila LNU" will not be called as a witness at trial. Rather, plaintiff lists her as a witness who "may testify *by deposition* at trial if the need arises."[80] The time for *deposing witnesses* expired long ago;[81] and,

---

[79]*See* doc. no. 13 (scheduling order) and 32 (plaintiff's witness and exhibit list).

[80]Doc. no. 32, at 2 (emphasis supplied).

[81]*See* doc. nos. 13 (scheduling order), ¶ 2 ("All discovery must be commenced in time to be completed by November 3, 2003.").

a  plaintiff's "testimony recounting what [another person] allegedly told [her] does not raise a genuine fact issue because it is hearsay." *Churchill Business Credit, Inc. v. Pacific Mutual Door Co.*, 49 F.3d 1334, 1337 (8th Cir.1995); *see also Firemen's Fund Insurance Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir.1993) ("Inadmissible hearsay evidence alone may not defeat a summary judgment motion"); *United States v. Jefferson*, 925 F.2d 1242, 1252-53 (10th Cir.1991) ("Whether evidence is offered as circumstantial evidence as opposed to direct evidence has nothing to do with whether it constitutes inadmissible hearsay"); *see also*, *e.g.*, *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) ("Hearsay testimony cannot be considered because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'") (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)).

2.     **Statements by Dedra Patrick, "Dianne," "Candace," and Doris Chambers that they believed defendant discriminated against them on the basis of race**

Plaintiff testified during deposition that another black co-employee, Dedra Patrick, after being terminated, stated her belief that Moretti and Davis had fired her because of her race.  In addition, plaintiff argued in her brief that "Dianne [LNU], Candace [LNU], Doris [Chambers], Kenyata [Mabry],[82] all African-American

---

[82]Plaintiff did not specify how defendant might have discriminated against Kenyata Mabry, apart from that Mary Davis imitated Mabry's speech.  Plaintiff did testify that defendant terminated

employees, . . . discussed their experiences of racial discrimination at Dillard's with [plaintiff]."[83]  During deposition, plaintiff testified that the individual identified only as "Dianne" generally stated her opinion ("feeling") that defendant "practices discrimination against blacks."  Plaintiff either could not relate, or did not know, the basis for "Dianne's" opinion:  "Specifically I didn't ask the specifics.  We were out in public."[84]  With regard to Doris Chambers, plaintiff either did not know the basis for her opinion, or refused to disclose it to defendant's attorney, saying that Doris Chambers could speak "to her own situation and experience at Dillard's."[85]  The same is true with regard to the individual identified only as "Candace":

> Q:     How about Candace, last name unknown?
>
> A:     *She could give you her story.*
>
> Q:     What happened with her?
>
> A:     *Specifically I don't know with her.*
>
> Q:     Has she told you that she felt she was discriminated against on the basis of race?
>
> A:     She has told me that, yes, sir.

---

Mabry.  Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 233.  The court will not discuss Mabry in this section of its opinion because there is insufficient evidence regarding Mabry's termination.

[83]Doc. no. 35 (Plaintiff's Brief), at 8.

[84]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 237.

[85]*Id.* at 238.

Q:    Was she terminated?

A:    She was — when I was terminated, she was still there.  *I don't know what happened to Candace*.[86]

Again, however, "Plaintiff's Final Witness and Exhibit List" establishes that only Doris Chambers can be called as a witness at trial:  *i.e.*, she lists Dedra Patrick, "Candace LNU," and "Dianne LNU" as being potential witnesses whose "address[es are] unknown at this time, but who "may testify *by deposition* at trial if the need arises."[87]  As discussed in the preceding section, the time for *deposing witnesses* has expired; and, a plaintiff's "testimony recounting what [another person] allegedly told [her] does not raise a genuine fact issue because it is hearsay."  *Churchill Business Credit*, 49 F.3d at 1337.

Even laying aside the hearsay objections to such evidence,[88] the testimony of all of these persons amounts only to what is sometimes called "me, too" evidence. Plaintiffs in employment discrimination sometimes attempt to reference the situations faced by other persons sharing similar protected characteristics as support for their individual claims of disparate treatment.  In such cases, as here, a plaintiff will

---

[86]*Id*. at 233-234 (emphasis supplied).

[87]Doc. no. 32, at 2 (emphasis supplied).

[88]Federal Rule of Evidence 901(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Rule 802 provides that "Hearsay is not admissible except as provided by these rules . . . ."

attempt to offer proof about other persons who, like the plaintiff, believed they suffered adverse employment actions at the hands of an employer because of their race, or some other statutorily-protected characteristic.  Through an offer of such evidence, the plaintiff pursues the following theory of discrimination:  "It happened to them; *therefore*, *it must have happened to me, too*."

Such evidence normally is not admissible, however, because the probative value of such proof usually "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  *See also Reed v. National Linen Service*, 182 F.3d 918 (6th Cir. 1999) (table) (text in Westlaw, 1999 WL 407463, at *7) ("Trial courts regularly prohibit 'me too' evidence from or about other employees who claim discriminatory treatment because it is highly prejudicial, but only slightly relevant."); *McLaughlin v. Essette Pendaflex Corporation*, 50 F.3d 507, 512 (8th Cir. 1995) (noting that plaintiff failed to demonstrate discriminatory bias by presenting supportive witnesses who had no involvement in decision-making process); *Sorenson v. City of Aurora*, 984 F.2d 349, 354-55 (10th Cir. 1993) (upholding trial court's decision to exclude evidence indicating that other female employees complained of discrimination and retaliation, because that evidence was irrelevant and confusing); *Haskell v. Kaman Corporation*,

743 F.2d 113, 121-22 (2d Cir. 1984) (noting that testimony of former company officers who were terminated was substantially outweighed by danger of unfair prejudice); *Yellow Bayou Plantation, Inc. v. Shell Chemical, Inc.*, 491 F.2d 1239, 1242-43 (5th Cir. 1974) (upholding trial court's discretionary decision to exclude evidence of prior employment discrimination lawsuit commenced against defendant, because of high potential for unfair prejudice).

Consideration of anecdotal case studies in the context of an individual plaintiff's claim of disparate treatment raises issues of prejudice and relevance, as well as placing an undue burden on the defendant-employer, who is forced to either defend each situation — *i.e.*, defend several employment discrimination claims within one lawsuit — or leave the testimony of the "me too" witnesses unrebutted. Under either approach, the prejudice accruing to the defendant considerably overshadows any relevance to the particular plaintiff's case, which must focus upon the facts related to the plaintiff's *specific claim — not* some other adverse employment actions experienced by other employees, under circumstances wholly unrelated to the facts of the plaintiff's case. Such evidence serves only to cloud dispositive issues, confuse the jury, and prolong trial proceedings for an unreasonable length of time.

Another reason for rejecting so-called "me too" evidence at the summary judgment stage is found in that line of cases holding that a federal court's proper role

46

is not that of micro-managing the decisionmaking processes of employers. *See, e.g., Elrod v. Sears, Roebuck & Company*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'") (quoting *Mechnig v. Sears, Roebuck & Company*, 864 F.2d 1359, 1365 (7th Cir. 1988) (other citations omitted)). Rather, it is to ensure that those processes are conducted without reference to considerations of race, religion, color, gender, national origin, age, or disability. To resolve such issues of federal concern, it is imperative that district courts compare a particular plaintiff's treatment by her employer to the employer's treatment of similarly-situated individuals *outside* that plaintiff's protected classification. Anecdotal evidence concerning the predicaments faced by individuals sharing the same protected characteristic as the plaintiff does not aid the court in analyzing the plaintiff's individual claim of disparate treatment.

### 3.    The knife incident

Plaintiff argues that the incident during which Moretti "used a knife to apprehend a black customer" suspected of shoplifting also is evidence that she had been subjected to a racially hostile work environment. This incident occurred during July of 2002, approximately eighteen months after plaintiff's termination. Accordingly, it is not relevant. Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is

47

of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The fact that Moretti brandished a pocket knife, allegedly to defend himself when the suspected thief reached for something in her handbag, is neither relevant to, nor probative of, the issue of whether plaintiff had been subjected to a racially hostile working environment. "Evidence which is not relevant is not admissible." Fed. R. Evid. 402.

### 4.    Events on the date of termination

Furthermore, plaintiff's conclusory and argumentative assertion that Moretti and Davis "immediately suspected and accused [plaintiff] of theft"[89] on the date of her termination also is neither relevant to, nor admissible evidence of, a hostile work environment. The circumstances of plaintiff's firing might have an inferential bearing upon the issue of whether plaintiff's termination was racially motivated, but to be probative plaintiff still must establish that other, similarly-situated, non-black (white) employees engaged in the same or similar conduct, but were not "immediately suspected and accused of," or terminated for, theft. As previously discussed in Part II(C) of this opinion, she has not done so.

### 5.    The admissible evidence bearing upon plaintiff's hostile work environment claim

The admissible evidence bearing upon plaintiff's racially hostile work environ-

---

[89]Doc. no. 35 (Plaintiff's Brief), at 9.

ment claim thus comes down to this:  Moretti, Davis, and Karen Summers denied plaintiff's scheduling requests, but accommodated similar requests by white employees; and, Mary Davis mocked Kenyata Mabry's speech.  Such evidence totally fails to satisfy the fourth element of a *prima facie* case:  *i.e.*, the harassment was either sufficiently severe or pervasive as to alter the terms and conditions of plaintiff's employment, and created a discriminatorily abusive working environment. That element contains both an objective and subjective component.  To be actionable, a plaintiff must show not just that she subjectively believed the environment to be hostile or abusive, but that a reasonable person also would perceive it as such.  *Cf., e.g., Harris v. Forklift Sytems, Inc.*, U.S. 17, 21-22, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993).  When evaluating the objective severity of the harassment, district courts must examine all of the circumstances, which may include such factors as:  the frequency (*i.e., pervasiveness*) of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and, whether the conduct unreasonably interfered with the plaintiff's work performance.  *Id*. at 23, 114 S. Ct. at 371; *see also, e.g., Miller v. Kenworth of Dothan*, *Inc.*, 277 F.2d 1269, 1276 (11th Cir. 2002); *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997).

Mary Davis's mocking imitation of Kenyata Mabry's speech unquestionably

was insensitive, and would have been offensive to any fair-minded person of ordinary sensibilities, regardless of race. Nevertheless, the court cannot conclude that this single act, which was immediately apologized for, was so "severe" or "humiliating" as to create an actionable hostile work environment.

That incident should be compared to *Miller v. Kenworth of Dothan*, *Inc.*, 277 F.3d 1269 (11th Cir. 2002), a case in which the Hispanic plaintiff's co-workers often taunted him with disparaging names like "Julio," "Chico," "Taco," "Wetback," "Spic," and "Mexican Mother F-----." *Id.* at 1273-1274. The Eleventh Circuit concluded that "a reasonable jury could have considered [such conduct] to be severe." *Id.* at 1276. The plaintiff "did not suffer from overhearing occasional off-color comments. Rather, [plaintiff's co-workers] used the derogatory names in an intimidating manner, shouting them at [plaintiff] during the course of berating him for his job performance, or when they were 'arguing with him,' were 'mad with him,' or were 'taunting him.'" *Id.* at 1277 (quoting witness testimony). The Eleventh Circuit added that "the very nature of the coworkers' utterances, coupled with the fact that they were directed at [plaintiff] and were sometimes used in the course of reprimanding him in front of others," also established that these incidents were "humiliating." *Id.*

Here, in contrast, plaintiff did not personally overhear Mary Davis mocking

Kenyata Mabry, but the fact that Davis did not directly subject plaintiff to racially offensive conduct is not necessarily determinative.  *See Walker v. Ford Motor Company*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982) ("The fact that many of the epithets were not directed at [plaintiff] is not determinative.  The offensive language often was used in [plaintiff's] presence after he had voiced objections to the [the employer].")  Nevertheless, this court is not aware of any Eleventh Circuit precedent in which a plaintiff's second-hand knowledge of a supervisor's single, racially-offensive statement has been deemed to constitute "severe" or "humiliating" harassment.

Furthermore, defendant did not subject plaintiff to severe harassment when it denied her scheduling requests.  In *DeNovellis v. Shalala*, 124 F.3d 298 (1st Cir. 1997), for example, the First Circuit held that demoting an employee to a "purgatory assignment"[90] was not sufficiently "severe" to constitute, by itself, a hostile work environment.  *Id.* at 311.  Of course, the First Circuit's holding in *DeNovellis* is not binding upon this court, but it is persuasive.  If demotion to a "purgatory assignment" is not sufficiently "severe" to be actionable, denying scheduling requests certainly will not rise to that standard.

---

[90]The plaintiff was demoted from the position of Deputy Regional Administrator of the Boston Regional Office of Human Development Services to what plaintiff described as temporary "meaningless" positions, including assignment to an "unestablished position" in the Office of Fiscal Operations.  *DeNovellis*, 124 F.3d 298, 302-304 (1st Cir. 1997).

51

Another factor bearing upon the pervasiveness of the conduct complained of is how frequently defendant engaged in objectionable conduct.  In *Mendoza v. Borden*, 195 F.3d 1238 (11th Cir. 1999), the court held that five sexually-oriented incidents over an eleventh month period — or roughly one incident every sixty-six days — "were far too infrequent to alter the conditions under which [plaintiff] was required to perform her job." *Id.* at 1249.  In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit concluded that "roughly fifteen separate instances of harassment over the course of four months" — or roughly one instance of harassment every 8 days — was sufficiently frequent, and distinguished that case from *Mendoza*, "where there were fewer instances of less objectionable conduct over longer periods of time." *Id.* at 509.

Mary Davis's mocking imitation of Kenyata Mabry's speech was immediately apologized for, apparently forgiven (plaintiff "witnessed the consoling.  They were hugging each other"[91]), and did not occur again.  This amounts to one incident during a span of slightly more than four months, which is far too infrequent to establish a hostile work environment under Eleventh Circuit precedent.  Plaintiff's position improves, but only to a degree, if the court construes the denials of her scheduling requests as acts of "racial harassment," because it affected the terms, conditions, or

---

[91]Doc. no. 29 (Defendant's Evidentiary Submission), Harris Deposition at 126.

privileges of her employment.  *Cf.* 42 U.S.C. § 2000e-2(a)(1).  Plaintiff testified that her supervisors denied her requests for particular days off a total of four to six times. Assuming that she was denied six times, such a number is greater than the frequency in *Mendoza*, but still below the frequency in *Johnson*.

The final factor for consideration is whether defendant's conduct interfered with plaintiff's job performance.  *See, e.g., Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("The fourth factor in determining whether conduct and statements are 'sufficiently severe or pervasive' to create a hostile work environment is whether the conduct and statements unreasonably interfere with the plaintiff's job performance — a factor which involves both a subjective and objective inquiry) (citing *Mendoza*, 195 F.3d at 1246).  There is no evidence that any of the incidents about which plaintiff complains interfered with her ability to perform the normal duties of her job.

In sum, defendant did not subject plaintiff to harassment that was either severe or pervasive.  There also is no evidence that defendant's harassment interfered with plaintiff's job performance.  Accordingly, defendant's motion for summary judgment on plaintiff's hostile work environment claim is due to be granted.

## F.    Plaintiff's Remaining State Law Claims

Plaintiff claims under Alabama law that defendant negligently and/or

maliciously[92] trained, supervised, and retained Steve Moretti and Mary Davis, and that such conduct proximately caused plaintiff's injuries.[93]

In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are supplemental to the federal claim. *See* 28 U.S.C. § 1367(a).[94]  The district court may decline to exercise supplemental jurisdiction when:

(1)    the claim raises a novel or complex issue of State law,

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)    the district court has dismissed all claims over which it has original jurisdiction, or

(4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

---

[92]The court could not find any Alabama case law recognizing a claim of "malicious" training or supervision.  However, the court did find cases recognizing claims of "wanton" supervision and training, and assumes that plaintiff meant to proceed under this theory. *See, e.g., Big B, Incorporated v. Cottingham*, 634 So. 2d 999, 1004 (Ala. 1993) (recognizing plaintiff's "wanton training and supervision" claim.)

[93]Doc. no. 8 (second amended complaint), ¶¶ 22-27.

[94] 28 U.S.C. § 1367(a) provides that:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(c).  The Supreme Court added a gloss to this statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988), when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*Id*. at 349-50, 108 S. Ct. at 618 (emphasis supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7, 108 S. Ct. at 619 n.7; *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims").

Here, the court has determined that summary judgment is due to be entered in

favor of defendant on all of the plaintiff's federal claims, and the court declines to exercise jurisdiction over her state law negligence claims because they present a question of first impression in Alabama.  Defendant argues that "plaintiff seeks to recast her race discrimination claims as state law tort claims for negligence."[95] Defendant claims this is impermissible, because plaintiff must establish that defendant committed a common law tort recognized under Alabama law.  "Race discrimination is not considered a tort under Alabama law."[96]  Defendant did not cite a state court decision to support this contention, but instead cited an unpublished decision of the United States District Court for the Southern District of Alabama reading, in part, as follows:

> Count Two of the [plaintiff's] complaint purports to state a claim for negligent and/or wanton supervision and retention.  In effect, the claim is that Boise Cascade negligently allowed its supervisors to discriminate against the plaintiff because of race.  The Alabama Supreme Court has not, however, recognized the tort of negligent supervision (or retention) in the context of a race discrimination in employment case.  While the Alabama Supreme Court has recognized the tort of negligent supervision and negligent hiring where injuries have resulted from the incompetency or intentional conduct of an employee, the Court has not addressed whether the torts are cognizable in the context of an employment discrimination case.  This Court agrees with defendant's assessment that it is unlikely the Alabama Court would extend the negligent hiring or supervision tort to include employment discrimination claims since the extension would transform routine employment discrimination cases into state law torts and would undermine Alabama's employment-at-will

---

[95]Doc. no. 30 (Defendant's Brief), at 14.

[96]*Id.*

doctrine.  Certainly, this Court declines to so extend the common law
tort of negligent supervision or retention.

*Hathorn v. Boise Cascade Corporation*, No. 97-0521-BH-M, 1998 U.S. Dist. LEXIS

18113, at * 24-25 (S.D. Ala. Nov. 3, 1998) (Hand, J.).

Even so, this court is not so certain that the appellate courts of Alabama will

decline to extend that State's negligent hiring, supervision, and retention theories to

encompass claims of racial harassment.  In *Stevenson v. Precision Standard, Inc.*, 762

So. 2d 820 (Ala. 2000), for example, the Supreme Court of Alabama recognized that

"claims of *sexual* harassment are maintained under common-law tort theories such as

. . . negligent training and supervision . . . ."  *Id.* at 825 n.6 (emphasis supplied)

(citing *Mardis v. Robbins Tire & Rubber Company*, 669 So. 2d 885 (Ala. 1995) (other

citations omitted)).  The *Stevenson* Court elaborated that "the manner in which a

sexual-harassment complaint is handled when sexual harassment has, in fact,

occurred could form the basis for a claim for negligent or wanton supervision."  *Id.*

at 825.

Federal law has long recognized a close relationship between claims of racial

harassment and sexual harassment.[97]  Accordingly, the courts of the State of Alabama,

---

[97]As Justice Thomas observed in his dissenting opinion in *Burlington Industries, Inc. v.
Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998):

[y]ears before sexual harassment was recognized as "discriminat[ion] . . .
because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), the Courts of Appeals considered

and not this court, should decide whether the theories of negligent training, supervision, and retention encompass claims of racial harassment.  For all of these reasons, plaintiff's state law claims shall be dismissed without prejudice.

### III. CONCLUSION

In accordance with the foregoing discussion, defendant's motion for summary judgment on plaintiff's discriminatory discharge, retaliation, hostile work environment, promotion, pay, and scheduling claims will be granted, and all of such claims dismissed with prejudice.  Plaintiff's state law claims will be dismissed without prejudice.  An appropriate order will be entered contemporaneously herewith.

---

whether, and when, a racially hostile work environment could violate Title VII.  In the landmark case *Rogers v. EEOC*, 454 F.2d 234 (1971), *cert. denied*, 406 U.S. 957, 92 S. Ct. 2058, 32 L. Ed. 2d 343 (1972), the Court of Appeals for the [former] Fifth Circuit held that the practice of racially segregating patients in a doctor's office could amount to discrimination in "'the terms, conditions, or privileges'" of employment, thereby violating Title VII.  *Id.*, at 238 (quoting 42 U.S.C. § 2000e-2(a)(1)) . . . .

Accordingly, after *Rogers*, a plaintiff claiming employment discrimination based upon race could assert a claim for a racially hostile work environment, in addition to the classic claim of so-called "disparate treatment" . . . .  A hostile environment claim required the plaintiff to show that his work environment was so pervaded by racial harassment as to alter the terms and conditions of his employment.  *See, e.g., Snell v. Suffolk Cty.*, 782 F.2d 1094, 1103 (C.A.2 1986) ("To establish a hostile atmosphere, . . . plaintiffs must prove more than a few isolated incidents of racial enmity"); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (C.A.8 1981) (no violation of Title VII from infrequent use of racial slurs)  This is the same standard now used when determining whether sexual harassment renders a work environment hostile.  *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370-371, 126 L. Ed. 2d 295 (1993) (actionable sexual harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult") (emphasis added) (internal quotation marks and citation omitted).

*Id.* at 767-68; 118 S. Ct. at 2271-72 (Thomas, J., dissenting) (footnote omitted).

_____DONE this 30th day of November, 2004.

_____
United States District Judge